## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

CAROLE BAUGH, as the surviving spouse
of WILLIAM JOSEPH BAUGH, SR.,
deceased, and
as the soon to be appointed
ADMINISTRATOR
OF THE ESTATE OF WILLIAM JOSEPH
BAUGH, SR.,

**Plaintiffs,**

v.

HILLTOP LODGE HEALTH AND
REHABILITATION CENTER, LLC
<u>Serve:</u>
PLATINUM FILINGS LLC
112 SW 7th St. Suite 3C
Topeka, KS 66603

MRC SNF MANAGEMENT, LLC
<u>Serve:</u>
Platinum Filings LLC
112 SW 7th St. Suite 3C
Topeka, KS 66603

**Defendants.**

Case No. 2:25-cv-02767

**JURY TRIAL DEMANDED**

## PLAINTIFFS' COMPLAINT FOR DAMAGES

The Plaintiffs, by and through undersigned counsel, submit this Complaint for

Damages against the above-named Defendants, and in further support, state and

allege as follows:

## PLAINTIFFS

1.     William Joseph Baugh, Sr. ("Resident" or "Mr. Baugh") was a 52-year-old man

who was admitted to Hilltop Lodge Health and Rehabilitation Center on March 11,

2021, for skilled nursing care following a respiratory arrest during colonoscopy that

resulted in tracheostomy.

2.     On December 27, 2023, Mr. Baugh was found unresponsive in his room at Hilltop Lodge after his roommate heard him calling for help and alerted staff. Mr. Baugh was transferred first to Mitchell County Hospital and then to Wesley Medical Center in Wichita, Kansas, where he died on December 31, 2023.

3.     The death certificate lists three causes of death: (1) Respiratory Failure; (2) Pneumonia; and (3) Pulmonary Embolism. Hospital records additionally document a massive bilateral cerebellar ischemic stroke, MRSA pneumonia, and septic shock—all confirmed as "Present on Arrival" from the nursing facility.

4.     Plaintiff Carole Baugh is an adult over the age of 21 and is a citizen of Kansas.

5.     Plaintiff Carole Baugh is the surviving spouse of Resident, and therefore, a member of the class of individuals authorized to pursue a wrongful death claim pursuant to K.S.A. § 60-1902.

6.     Plaintiff Carole Baugh is the soon to be appointed Administrator of the Estate of the Resident/Decedent.

7.     The Estate will be a citizen of Kansas.

### DEFENDANTS

8.     Plaintiffs incorporate by reference the allegations previously set forth and further allege as follows:

### HILLTOP LODGE HEALTH AND REHABILITATION CENTER, LLC

9.     At all times relevant, HILLTOP LODGE HEALTH AND REHABILITATION CENTER, LLC was a Kansas limited liability company and owned, operated, managed, maintained, and/or controlled, in whole or in part, and did business as Hilltop Lodge Health and Rehabilitation Center, located at 815 N Independence Avenue, Beloit, Kansas 67420.

10.    As such, HILLTOP LODGE HEALTH AND REHABILITATION CENTER, LLC was engaged in providing ancillary medical services to persons requiring such services, including Resident, by owning, operating, managing, maintaining, and controlling HILLTOP LODGE HEALTH AND REHABILITATION CENTER, LLC.

11.    Consequently, HILLTOP LODGE HEALTH AND REHABILITATION CENTER, LLC owed a duty to Resident to use reasonable care for Resident's safety while under the care and supervision at HILLTOP LODGE HEALTH AND REHABILITATION CENTER, LLC.

## MRC SNF MANAGEMENT, LLC

12.    At all times relevant, MRC SNF MANAGEMENT, LLC was a limited liability company and owned, operated, managed, maintained, and/or controlled, in whole or in part, HILLTOP LODGE HEALTH AND REHABILITATION CENTER, LLC.

13.    As such, MRC SNF MANAGEMENT, LLC was engaged in providing ancillary medical services to persons requiring such services, including Resident, by owning, operating, managing, maintaining, and controlling HILLTOP LODGE HEALTH AND REHABILITATION CENTER, LLC.

14.    Consequently, MRC SNF MANAGEMENT, LLC owed a duty to Resident to use reasonable care for Resident's safety while under the care and supervision at HILLTOP LODGE HEALTH AND REHABILITATION CENTER, LLC.

15.    MRC SNF MANAGEMENT, LLC and/or individuals or entities acting on its behalf, operated, managed, maintained, and controlled HILLTOP LODGE HEALTH AND REHABILITATION CENTER, LLC by exercising final authority over: (1) Staffing budgets; (2) The development and implementation of nursing policies and procedures; (3) The hiring and firing of HILLTOP LODGE HEALTH AND REHABILITATION CENTER, LLC leadership.

16.    It was MRC SNF MANAGEMENT, LLC's intention to cut operating expenses at HILLTOP LODGE HEALTH AND REHABILITATION CENTER, LLC through cutting of labor expenses while increasing revenue through increased census.

17.    These actions and business decisions had a direct impact on the care provided to all residents including Resident.

18.    Consequently, MRC SNF MANAGEMENT, LLC owed a duty to Resident to use reasonable care for Resident's safety while under its care and supervision at HILLTOP LODGE HEALTH AND REHABILITATION CENTER, LLC and breached said duty for all the reasons stated in this Complaint.

**DEFENDANTS' JOINT ENTERPRISE/VENTURE**

19.    Plaintiffs incorporate by reference the allegations previously set forth and further allege as follows:

20.    Defendants HILLTOP LODGE HEALTH AND REHABILITATION CENTER, LLC and MRC SNF MANAGEMENT, LLC ("Joint Venture Defendants") were engaged in a joint venture in that:

a.    The Joint Venture Defendants had an agreement, express and/or implied, among the members of the group to operate HILLTOP LODGE HEALTH AND REHABILITATION CENTER, LLC, a Kansas licensed skilled nursing facility;

b.    The Joint Venture Defendants had a common purpose to operate HILLTOP LODGE HEALTH AND REHABILITATION CENTER, LLC, a Kansas licensed skilled nursing facility;

c.    The Joint Venture Defendants had a community of pecuniary interest in the operation of HILLTOP LODGE HEALTH AND REHABILITATION CENTER, LLC, a Kansas licensed skilled nursing facility; and

d.    The Joint Venture Defendants had an equal right to a voice in the direction of the operation of HILLTOP LODGE HEALTH AND REHABILITATION CENTER, LLC, a Kansas licensed skilled nursing facility.

21.    Because of the joint venture, the Joint Venture Defendants owed a joint duty to Resident to use reasonable care for their safety while under their care and supervision at HILLTOP LODGE HEALTH AND REHABILITATION CENTER, LLC.

## JURISDICTION AND VENUE

22.    Plaintiffs incorporate by reference the allegations previously set forth and further allege as follows:

23.    The sole member of HILLTOP LODGE HEALTH AND REHABILITATION CENTER, LLC is MIDWEST SNF HOLDINGS, LLC.

24.    The members of MIDWEST SNF HOLDINGS, LLC are AMNA HOLDINGS LLC; KANSAS SNF HOLDINGS LLC; MAD FAMILY HOLDINGS LLC; MARGULIES, ZISHA; NATR TRUST; NZM HOLDINGS LLC; RARMNA HOLDINGS LLC; RATR TRUST; MRC SNF MANAGEMENT LLC; RNR HOLDINGS LLC; and WETR TRUST.

25.    Upon information and belief, the sole member of AMNA HOLDINGS LLC; KANSAS SNF HOLDINGS LLC; MAD FAMILY HOLDINGS LLC; NZM HOLDINGS, LLC; RARMNA HOLDINGS LLC; RNR HOLDINGS LLC; and MRC SNF MANAGEMENT LLC is Zisha Margulies.

26.    Zisha Margulies is a citizen of New York State.

27.    Thus, upon information and belief, AMNA HOLDINGS LLC; KANSAS SNF HOLDINGS LLC; MAD FAMILY HOLDINGS LLC; NZM HOLDINGS, LLC; RARMNA HOLDINGS LLC; RNR HOLDINGS LLC; and MRC SNF MANAGEMENT LLC are citizens of New York State.

28.    Upon information and belief, the trustee of NATR TRUST; RATR TRUST; and WETR TRUST is Zisha Margulies.

29.     Thus, upon information and belief, NATR TRUST; RATR TRUST; and WETR TRUST are citizens of the State of New York.

30.     Thus, upon information and belief, MIDWEST SNF HOLDINGS LLC is a citizen of the State of New York, thereby making HILLTOP LODGE HEALTH AND REHABILITATION CENTER, LLC a citizen of the State of New York.

31.     The only member of MRC SNF MANAGEMENT LLC is Zisha Margulies.

32.     Zisha Margulies is a citizen of New York State.

33.     Thus, MRC SNF MANAGEMENT LLC is a citizen of the State of New York.

34.     Plaintiffs are each citizens of Kansas.

35.     Therefore, Plaintiffs bring these claims contained in the Complaint under federal diversity jurisdiction, 28 U.S.C. § 1332(a)(1), as the parties are completely diverse in citizenship and the amount in controversy exceeds $75,000.

36.     Pursuant to K.S.A. § 60-308(b)(2), defendants purposefully availed themselves of the protections and/or benefits of the laws in Kansas by entering into contracts with entities in Kansas that then permitted them to commit tortious acts within the state including, but not limited to, failing to ensure that HILLTOP LODGE HEALTH AND REHABILITATION CENTER, LLC had appropriate policies and procedures for its nursing staff, was properly capitalized, funded, staffed, and that staff received adequate training and supervision, thereby making jurisdiction proper in this Court.

37.     A substantial part of the events or omissions giving rise to the claims described in the Complaint occurred in Kansas, thereby making venue proper in this Court.

**AGENCY**

38.    The acts hereinafter described were performed by the agents, representatives, servants, and employees of Defendants and were performed either with the full knowledge and consent of Defendants, and/or were performed by their agents, representatives, servants, or employees during the scope of their agency, representation, or employment with the Defendants.

39.    Furthermore, the acts hereinafter described as being performed by the agents, representatives, servants, or employees of Defendants were performed or were supposed to be performed on behalf of and/or for the benefit of Resident.

**FACTUAL BACKGROUND**

40.    Plaintiffs incorporate by reference the allegations previously set forth and further allege as follows:

**<u>Resident's Medical History and Risk Factors</u>**

41.    At the time of his admission to Hilltop Lodge on March 11, 2021, Mr. Baugh presented with the following documented medical conditions: chronic respiratory failure with history of tracheostomy (ICD-10: Z93.0); obstructive sleep apnea (G47.33); morbid obesity with alveolar hypoventilation (E66.2) with a BMI of 63 and weight of 458.2 pounds; chronic diastolic heart failure (I50.32); hypertension with pacemaker; type 2 diabetes mellitus with diabetic foot ulcer (E11.621); peripheral vascular disease (I73.9); chronic peripheral venous insufficiency (I87.2); wheelchair dependence (Z99.3); difficulty in walking (R26.2); and muscle wasting and atrophy (M62.5A0).

42.    Throughout his stay at Hilltop Lodge, Mr. Baugh was documented to be cognitively intact with a BIMS score of 15/15 (perfect score) on all MDS assessments in 2022-2023, indicating he was fully oriented and capable of participating in care decisions.

43.    Mr. Baugh presented with virtually every major risk factor for deep vein thrombosis (DVT): complete immobility (wheelchair dependent with documented difficulty walking); morbid obesity (BMI 63); diagnosed chronic peripheral venous insufficiency; peripheral vascular disease; chronic diastolic heart failure; documented muscle wasting and atrophy indicating prolonged immobility; diabetes mellitus with foot ulcer; and chronic lower extremity wounds.

44.    Mr. Baugh's care plan included a focus statement acknowledging his risk: "I have hx of venous insufficiency and am at risk for blood clots." The intervention specified: "Check lower legs for signs and symptoms of clotting or restricted blood flow... numbness, swelling, pain, redness, warmth, or signs of clotting."

45.    Despite the documented care plan requirement establishing the facility's own recognition of his DVT risk, there is no evidence in the medical records that systematic DVT monitoring was ever performed. The facility documented the risk, created a monitoring protocol, and then failed to implement it.

### Active Physician Orders Governing Resident's Care

46.    Three critical physician orders governed Mr. Baugh's respiratory monitoring and were active at the time of his collapse:

a.    CPAP Order dated March 19, 2021, which stated: "CPAP full face or nasal mask @ settings of 12 cmh20 w humidified air w pulse oximetry monitoring to keep sats >88% at bedtime."

b.    Oxygen PRN Order dated March 11, 2021, which stated: "Oxygen PRN to maintain O2 sats between 88-92%. Notify physician. as needed for SOB/Dyspnea."

c.    Weekly Vital Signs Order dated January 17, 2023, which stated: "Weekly Vitals signs. Review vitals signs with MD as indicated. Notify if readings are outside of set parameters: SBP: >190 or <80 DBP: >105 or <45 Pulse: >100 or <45 Temp >100 O2: <88%."

8

## Complete Absence of DVT Prophylaxis

47.    Despite Mr. Baugh having every major DVT risk factor documented in his medical records, review of Hilltop Lodge's Order Summary Report reveals ZERO ORDERS for DVT prophylaxis throughout his entire 2+ year stay—no compression stockings, no sequential compression devices, no low-dose anticoagulation, no regular lower extremity DVT assessments, and no mobility or repositioning program for this completely immobile resident.

48.    On June 20, 2023, within a sixteen-minute window between 22:57 and 23:13, the facility discontinued ACE wraps for bilateral lower extremities, leg soaks, and itch relief lotion—all leg care orders essential for DVT prevention in an immobile patient. The fact that three leg care orders were discontinued within a sixteen-minute window on the same evening indicates a deliberate facility decision to reduce care.

49.    On December 20, 2023, on the "third request," a verbal order was received to discontinue TED hose, lotion, foot soaks, and Vaseline "due to resident's continued refusal to comply with physician orders." Rather than implementing strategies to improve compliance, the facility simply discontinued protective DVT prophylaxis in a patient with every major risk factor for blood clots—one week before his collapse.

50.    In stark contrast, Wesley Medical Center immediately ordered "Intermittent Compression Device" and "VTE prophylaxis" upon Mr. Baugh's arrival on December 27, 2023, recognizing the extreme DVT risk that Hilltop Lodge ignored for nearly three years.

**Pattern of Ignored Life-Threatening Hypoxia (December 2022 - December 2023)**

51.     Treatment Administration Records document a systematic pattern of dangerously low oxygen saturations that were recorded but never addressed, spanning more than twelve months before Mr. Baugh's death:

   a.  On December 22, 2022, an oxygen saturation of 62% was documented—severe life-threatening hypoxia—yet no emergency response was initiated.

   b.  In November 2022, oxygen saturation of 74% was documented on two separate occasions without any intervention.

   c.  Multiple readings throughout 2022 fell between 82% and 88%, all below the facility's own notification threshold of 88%.

   d.  In February 2023, oxygen saturation readings of 74%, 83%, 84%, and 86% were documented without physician notification as required by active orders.

   e.  In March 2023, oxygen saturation readings of 78%, 86%, 86%, and 87% were documented without intervention despite falling below the 88% notification threshold.

   f.  From September through December 2023, consistent readings in the 87-90% range were documented without appropriate response.

52.     This pattern of ignoring life-threatening vital signs demonstrates a systemic failure, not an isolated incident.

**Discontinuation of Oxygen Monitoring**

53.     On May 22, 2023, at 08:09, Hilltop Lodge discontinued the order to "Check O2 sats every shift and PRN"—seven months before Mr. Baugh's death and despite the active CPAP order that required pulse oximetry monitoring to keep saturations above 88%. This made compliance with the CPAP order requiring pulse oximetry monitoring impossible.

**Critical Potassium Level Mismanagement**

54.     On October 11, 2023, Bactrim DS was ordered for wound infection. The system generated drug interaction warnings that should have prompted enhanced monitoring. The warning for the interaction with Lisinopril stated: "Hyperkalemia, possibly with cardiac arrhythmias or cardiac arrest, may occur with the combination of trimethoprim and ACE inhibitors." The warning for interaction with Spironolactone stated it "may increase the risk of hyperkalemia, especially in the elderly." Despite these warnings, no enhanced potassium monitoring was implemented.

55.     On November 1, 2023, the pharmacy consultant documented a potassium level of 6.6 mEq/L—a CRITICAL HIGH value (normal range 3.5-5.1 mEq/L). The consultant called Jessica Hawkins, APRN at BMC and noted: "Reviewed nurses notes and orders - none noted addressing this lab." Documentation confirmed Jessica Hawkins had reviewed the lab on October 28, 2023 at 5:41pm but no action was documented. Hyperkalemia at this level can cause cardiac arrhythmias and cardiac arrest—particularly dangerous in a patient with a pacemaker and heart failure.

**MRSA Infection and Failure to Implement Contact Precautions**

56.     In October 2023, Infection Control Worksheets documented "MRSA of heavy growth on aerobic bacteria culture of wound" from Mr. Baugh's leg wound. The facility failed to implement contact precautions, documented as "No" on multiple Antibiotic Symptom Monitoring forms.

57.     The same MRSA organism that was cultured from Mr. Baugh's leg wound in October 2023 was later cultured from his sputum at Wesley Medical Center, confirming MRSA pneumonia and suggesting a pathway for the development of MRSA pneumonia facilitated by the facility's failure to implement contact precautions.

**Impossible Vital Signs Documentation - Evidence of Falsification**

58.    On December 17, 2023, staff member mwihke1 documented a temperature of 96.6°F at 10:33. At 10:34—one minute later—the same staff member documented a temperature of 84°F. Core body temperature cannot drop 12.6°F in sixty seconds. This is physiologically impossible. Either the readings were fabricated (documenting readings not actually obtained), or the 84°F reading was accurate and represented profound hypothermia—a life-threatening medical emergency requiring immediate intervention. There is no documentation of any response to the 84°F reading. This evidence suggests vital signs documentation was unreliable and potentially falsified.

**Contradictory Physician Assessment**

59.    On December 10, 2023, a physician visit documented "No upper respiratory infections, dyspnea, cough or wheezing" and "Normal respiratory effort." This assessment is directly contradicted by the documented oxygen saturations of 87-90% throughout September-December 2023. A patient with oxygen levels consistently below 90% does not have "normal respiratory effort"—this suggests inadequate clinical assessment.

**December 26, 2023 - Critical Vital Signs Ignored**

60.    At 19:10 on December 26, 2023—approximately fourteen hours before Mr. Baugh was found unresponsive—the facility documented critical vital signs that demanded immediate intervention:

   a.    Oxygen saturation of 88% with a system alarm indicating "Low of 80.0 exceeded." This alarm meant that Mr. Baugh's oxygen saturation had dropped to 80% or below at some point—a life-threatening hypoxic emergency.

   b.    Temperature of 92°F—severe hypothermia. Normal body temperature is 97.8-99.1°F. A temperature of 92°F is incompatible with normal bodily function and promotes blood clot formation while worsening tissue oxygenation.

61.     Despite physician orders explicitly requiring notification for O2 saturation below 88%, the record contains NO documentation of physician notification. NO supplemental oxygen was administered. NO respiratory assessment was performed. NO evaluation for emergency transfer occurred. NO intervention of any kind was documented. A man whose oxygen had dropped to 80% and whose body temperature was 92°F was left alone in his room overnight without any medical response.

62.     Throughout the night of December 26, 2023, multiple entries documented "asleep/fails to acknowledge staff" or "refused to acknowledge staff" for nebulizer treatments and assessments. This social withdrawal and decreased responsiveness was consistent with developing sepsis and illness, but staff documented without recognizing it as a change in condition requiring assessment.

**December 27, 2023 - Emergency Discovery and Response Failure**

63.     At 09:36 AM on December 27, 2023, an IDT team meeting documented discussing Mr. Baugh's care—the notes indicate he "uses oxygen as needed" and "continues to use CPAP." No one conducted a bedside assessment.

64.     At approximately 09:50 AM, the progress note documents: "After taken by EMS, CMA reports another resident heard him calling for help. When CMA enters room, resident laying on back sideways in bed and face and lips were blue."

65.     Mr. Baugh's roommate heard him calling out for help during his respiratory emergency, but facility staff did not hear him. His roommate alerted staff. By the time help arrived, Mr. Baugh was purple/gray with blue lips and an oxygen saturation of 65%. The delay between a distressed, hypoxic patient calling for help and staff response allowed prolonged severe hypoxia, contributing to massive brain injury.

66.    The 911 call was received at 09:54:48. EMS arrived on scene at 09:59:37.

67.    The EMS narrative documented: "We received a 911 request for an ambulance at Hilltop Lodge to assist 52/M unresponsive but breathing. Upon arrival we found pt sitting up on the edge of the bed. Staff was behind pt holding him upright. Pt had a nasal cannula on. Pt was breathing shallow and a slow rate."

68.    At 10:01, the EMS exam documented the patient as CYANOTIC, Unresponsive, with a Glasgow Coma Scale of 3—the lowest possible score indicating no eye opening, no verbal response, and no motor response.

### Hospital Arrival and Critical Laboratory Findings

69.    Mr. Baugh arrived at Mitchell County Hospital ER at 10:28. His condition on arrival showed him unresponsive with agonal breathing, oxygen saturation in the 60s-70% (critically low—normal is 95-100%), and blood pressure of 72/35 (critically hypotensive indicating septic shock). Emergency intubation was performed at approximately 10:35, and he was started on Levophed (vasopressor) for shock.

70.    The Mitchell County Hospital ER note stated that Mr. Baugh "had been in his usual state of health up until this morning"—contradicting any theory of gradual decline and highlighting the acute nature of his deterioration from the facility's failure to respond to the December 26, 2023 critical vital signs.

71.    Laboratory findings obtained at Mitchell County Hospital on December 27, 2023 at 10:30 CST confirmed the severity of Mr. Baugh's condition upon arrival from Hilltop Lodge:

   a. D-Dimer: >4.40 mg/L (CRITICAL—nearly 9 times the upper limit of normal of 0.50 mg/L)—highly indicative of deep vein thrombosis and/or pulmonary embolism.

   b. Lactic Acid: 3.31 mmol/L (CRITICAL value indicating tissue hypoperfusion and septic shock—normal is less than 2.0 mmol/L)—indicating Mr. Baugh's tissues were not receiving adequate oxygen for hours before his collapse.

    c.  WBC: 16.8 K/uL (elevated indicating active infection—normal 4.5-10.5).

    d.  BUN: 41.0 mg/dL (elevated—normal 5.7-25.7 mg/dL).

    e.  Glucose: 181 mg/dL (elevated—normal 70-110 mg/dL).

## Hospital Diagnoses - All Present on Arrival from Hilltop Lodge

72.    The following diagnoses were confirmed at Wesley Medical Center. The designation "Present on Arrival" (POA) is critical—it establishes that these conditions existed when Mr. Baugh left Hilltop Lodge, not conditions that developed during hospitalization:

    a.  Acute Hypoxic Respiratory Failure (POA)

    b.  Severe Sepsis due to Pulmonary Source (POA)

    c.  Septic Shock (POA)

    d.  Aspiration Pneumonia (POA)

    e.  MRSA Pneumonia—sputum culture positive for Staphylococcus aureus MRSA

    f.  Bilateral Cerebellar Ischemic Stroke (POA)—confirmed by CT imaging showing "Hypodensity in the superior cerebellar hemispheres bilaterally, left more than right concerning for acute ischemia"

    g.  Bilateral Basilar Artery Stenosis (POA)

    h.  NSTEMI—cardiac injury from hypoxia and shock

    i.  Multiple Chronic Lower Extremity Wounds

73.    On December 30, 2023, bilateral lower extremity Doppler ultrasound at Wesley Medical Center confirmed: "Nonocclusive thrombus in the right common femoral vein"—confirming the DVT that caused the fatal pulmonary embolism, a DVT that developed as a direct result of Hilltop Lodge's complete failure to provide any DVT prophylaxis to a patient with every major risk factor.

74.     Wesley Medical Center neurology documented: "Found down, unresponsive. Unclear downtime, could be secondary to stroke/AHRF/hypotension/septic shock." The stroke was noted to be "outside the window for thrombectomy" and Mr. Baugh was "not a candidate for additional neuro interventions due to body habitus." The treating physicians noted: "This large stroke will likely have devastating impact on his quality of life."

**Causation: Death Certificate Causes Linked to Facility Failures**

75.     All three causes of death listed on the death certificate trace directly to Hilltop Lodge's documented failures:

> a.  RESPIRATORY FAILURE: Hilltop Lodge ignored documented oxygen saturation of 88% with alarm indicating it had dropped to 80%, despite active physician orders requiring notification for O2 below 88%. The facility discontinued oxygen monitoring seven months before death, making compliance with the CPAP order requiring pulse oximetry monitoring impossible. No respiratory assessment was documented in the days preceding Mr. Baugh's collapse, despite his known chronic respiratory failure, sleep apnea, alveolar hypoventilation, and history of respiratory arrest requiring tracheostomy.

> b.  PNEUMONIA (MRSA): Hilltop Lodge failed to recognize and respond to developing sepsis in a high-risk respiratory patient. There is no documentation of respiratory assessment, lung sound evaluation, or sputum monitoring in the days preceding Mr. Baugh's collapse. The facility failed to ensure nebulizer treatments for respiratory hygiene, despite the patient having identified a solvable problem (the mask was too large for his trach). The facility failed to recognize declining responsiveness as a change in condition. The same MRSA organism cultured from his leg wound in October 2023 was later cultured from his sputum, suggesting a pathway for MRSA pneumonia facilitated by the facility's failure to implement contact precautions.

> c.  PULMONARY EMBOLISM: The complete absence of DVT prophylaxis to a wheelchair-dependent, morbidly obese resident with documented venous insufficiency and heart failure over a 2+ year period represents a glaring breach of the standard of care. The DVT confirmed by Doppler ultrasound at Wesley Medical Center—nonocclusive thrombus in the right common femoral vein—developed because of this failure and embolized to the lungs, causing fatal pulmonary embolism.

> d.  BILATERAL CEREBELLAR STROKE (Contributing): The massive bilateral cerebellar stroke resulted from multiple mechanisms traceable to Hilltop Lodge's failures: prolonged severe hypoxia (O2 saturation in

the 60s-70s) causing brain ischemia; profound hypotension from septic shock (BP 72/35) reducing cerebral perfusion; severe hypothermia (92°F) increasing blood viscosity and promoting thrombosis; and possible paradoxical embolism from the confirmed DVT.

## MDS Documentation Inconsistencies

76.    A critical inconsistency exists between MDS assessments and nursing notes. Section E0800 (Rejection of Care) was coded "0" (behavior not exhibited) on all quarterly assessments: January 30, 2023, March 30, 2023, June 30, 2023, September 27, 2023, and the December 27, 2023 discharge assessment. Yet nursing notes extensively document care refusals during these same periods. This inconsistency suggests either the MDS was falsified to avoid regulatory scrutiny, or nursing notes exaggerated refusals to deflect responsibility for non-delivery of care. Either interpretation supports facility negligence.

## Undercapitalization/Underfunding at HILLTOP LODGE HEALTH AND REHABILITATION CENTER, LLC

77.    HILLTOP LODGE HEALTH AND REHABILITATION CENTER, LLC; MRC SNF MANAGEMENT, LLC (hereinafter collectively referred to as the "Corporate Defendants") had a duty to provide financial resources and support to HILLTOP LODGE HEALTH AND REHABILITATION CENTER, LLC in a manner that would ensure that each of their residents received the necessary care and services and attain or maintain the highest practicable physical, mental, and psychosocial well-being, consistent with their residents' comprehensive assessments and plans of care.

78.    The Corporate Defendants had a duty to provide sufficient financial resources to ensure there was enough properly trained and supervised staff to meet the needs of their residents.

79.    Upon information and belief, HILLTOP LODGE HEALTH AND REHABILITATION CENTER, LLC had no autonomy to decide their own financial course, including no authority to determine how much staff they could provide or what resources were available to the staff.

80.    Upon information and belief, no individuals at HILLTOP LODGE HEALTH AND REHABILITATION CENTER, LLC are involved in decision making about the financial operations or what its resources were and where they would be spent.

81.    Transactions directed by the Corporate Defendants left HILLTOP LODGE HEALTH AND REHABILITATION CENTER, LLC with insufficient cash to provide sufficient qualified staff to meet the individual needs of the residents in their facility during Resident's time there.

## LEGAL BASIS FOR CORPORATE DEFENDANTS' LIABILITY

### Joint Venture/Enterprise

82.    As stated above, HILLTOP LODGE HEALTH AND REHABILITATION CENTER, LLC; MRC SNF MANAGEMENT, LLC are referred to herein as the "Corporate Defendants."

83.    The Corporate Defendants directed, operated, and managed the day-to-day functions of their skilled nursing facilities—including HILLTOP LODGE HEALTH AND REHABILITATION CENTER, LLC—by developing and implementing policies, practices and procedures affecting all facets of HILLTOP LODGE HEALTH AND REHABILITATION CENTER, LLC, including resident care.

84.    These policies manipulate and control the physical and financial resources and prohibit decision making at HILLTOP LODGE HEALTH AND REHABILITATION CENTER, LLC level.

85.     This directly affects resident care by determining things such as what type and quality of nourishment is available for residents; what safety measures may and may not be used depending upon cost; the integrity of the building itself; and most importantly, how much staff is available to provide resident care and how well trained and supervised are the staff to meet the needs of the residents.

86.     The Corporate Defendants affirmatively chose and decided to establish such operations and demand they be implemented.

87.     Upon information and belief, such operations included the following dangerous policies and practices: (a) the aggressive recruitment and admission of high acuity patients to increase the patient census when Defendants had already chosen to understaff HILLTOP LODGE HEALTH AND REHABILITATION CENTER, LLC and continually maintain a staff that were not qualified nor competent to provide the care required by state law, regulations and minimum standards of the medical community; and (b) the decision to retain residents whose needs exceeded the qualification and care capability of HILLTOP LODGE HEALTH AND REHABILITATION CENTER, LLC's staff.

88.     The Corporate Defendants consciously chose not to implement safety policies, procedures and systems which would ensure that: (a) the acuity levels and needs of residents were consistent with the numbers and qualifications of direct caregivers; and (b) treatment/care prescribed by a physician was provided in accordance with state laws and professional standards.

89.     The Corporate Defendants conducted themselves in a manner which indicates a joint venture/enterprise:

> a.  The shared interest in the operation and management of skilled nursing facilities;

      b.  The express and implied agreements amongst them to share in the profits and losses of such venture/enterprise; and

      c.  The obvious actions taken showing the cooperation in furthering the venture/enterprise operating and managing skilled nursing facilities.

90.    Kansas law recognizes a joint venture/enterprise where the parties alleged to be partners in such venture/enterprise share a common interest in the property or activity or the joint venture; maintain agreements, either express or implied, to share in profits or losses of the venture/enterprise; and express actions or conduct showing cooperation in the project of the venture/enterprise.

91.    The Corporate Defendants and HILLTOP LODGE HEALTH AND REHABILITATION CENTER, LLC maintain agreements to share in the profits or losses of the operation of skilled nursing facilities described herein; and operate daily evincing conduct which indicates their cooperation in the venture of operating and managing skilled nursing facilities for profit.

92.    The Corporate Defendants and HILLTOP LODGE HEALTH AND REHABILITATION CENTER, LLC took direct, overt, and specific actions to further the interest of the joint enterprise.

93.    These actions were taken through a joint venture/enterprise or through the Corporate Defendants and HILLTOP LODGE HEALTH AND REHABILITATION CENTER, LLC's officers, directors, managers and or employees.

94.    The Corporate Defendants had an equal right to share in the profits and to bear liability for, the joint venture/enterprise.

95.    Further, because the Corporate Defendants and HILLTOP LODGE HEALTH AND REHABILITATION CENTER, LLC were dominated by each other, these entities had an equal right to direct or control their venture, as well as to direct or control the operation and management of HILLTOP LODGE HEALTH AND REHABILITATION CENTER, LLC.

### Direct Participation/Individual Actions

96.    The Corporate Defendants were always material to this lawsuit in the business of managing, owning, and operating a network of skilled nursing facilities throughout Kansas and the country. One such skilled nursing facility was HILLTOP LODGE HEALTH AND REHABILITATION CENTER, LLC where Resident was admitted for care and treatment.

97.    At all times material to this lawsuit, the Corporate Defendants were fully aware that the delivery of essential care services in each of their skilled nursing facilities—including HILLTOP LODGE HEALTH AND REHABILITATION CENTER, LLC—hinged upon three fundamental fiscal and operational policies which were dictated by their choices on establishing and implementing such policies: (1) the determination of the numbers and expenditures on staffing levels; (2) the determination of the census levels within the skilled nursing facilities; and, (3) payor mix.

98.    At all times material, the Corporate Defendants made critical operational decisions and choices which manipulated and directly impacted HILLTOP LODGE HEALTH AND REHABILITATION CENTER, LLC's revenues and expenditures. More particularly, the Corporate Defendants determined:

> a.  The number of staff allowed to work in their chains of skilled nursing facilities including HILLTOP LODGE HEALTH AND REHABILITATION CENTER, LLC;

b. The expenditures for staffing at the skilled nursing facilities including HILLTOP LODGE HEALTH AND REHABILITATION CENTER, LLC;

c. The revenue targets for each skilled nursing facility including HILLTOP LODGE HEALTH AND REHABILITATION CENTER, LLC;

d. The payor mix, and census targets for each skilled nursing facility including HILLTOP LODGE HEALTH AND REHABILITATION CENTER, LLC;

e. Patient recruitment programs and discharge practices at each skilled nursing facility including HILLTOP LODGE HEALTH AND REHABILITATION CENTER, LLC.

99.   All cash management functions, revenues and expenditure decisions at the skilled nursing facilities level—including HILLTOP LODGE HEALTH AND REHABILITATION CENTER, LLC—were tightly managed, directed, and supervised by the Corporate Defendants.

100.   It was the choices made by the Corporate Defendants which directly fixed the circumstances in the facilities and the level of care that could, and was, provided at the homes, including HILLTOP LODGE HEALTH AND REHABILITATION CENTER, LLC.

101.   The Corporate Defendants formulated, established and mandated the application and implementation of the policies regarding the staffing levels and expenditures, the census levels, and payor mix.

102.   The census edicts, marketing and admission practices, and resident discharge policies designed and mandated by the Corporate Defendants were implemented and such application was carefully supervised and enforced.

103.   Following the mandates, HILLTOP LODGE HEALTH AND REHABILITATION CENTER, LLC functioned in accordance with them, filling empty beds, recruiting high acuity patients, and maintaining a census level and staffing level established and enforced as the Corporate Defendants deemed appropriate.

104.    Accordingly, such manipulation by the Corporate Defendants as to staffing and census were motivated by the financial needs of the Corporate Defendants and HILLTOP LODGE HEALTH AND REHABILITATION CENTER, LLC as opposed to the acuity levels and needs of the residents as dictated by state and federal laws and regulations.

105.    Instead of abiding by their duty to care for the residents, the Corporate Defendants chose to be guided by financial motivation which was simply to increase revenues while restricting and/or reducing expenses.

106.    The Corporate Defendants, therefore, directly participated in a continuing course of negligent conduct, requiring HILLTOP LODGE HEALTH AND REHABILITATION CENTER, LLC to recruit and retain heavier care, higher pay residents to HILLTOP LODGE HEALTH AND REHABILITATION CENTER, LLC even though the needs of the patient population far exceeded the capacity of staff.

107.    At the same time, the Corporate Defendants chose to design, create, implement, and enforce operational budgets at HILLTOP LODGE HEALTH AND REHABILITATION CENTER, LLC which dictated the level of care that could be provided and therefore deprived residents care, creating widespread neglect.

108.    In so doing, the Corporate Defendants disregarded, superseded, and violated the duties and responsibilities imposed on a licensed skilled nursing facility, in this case HILLTOP LODGE HEALTH AND REHABILITATION CENTER, LLC, by the State of Kansas.

**Corporate Malfeasance**

109.    The Corporate Defendants consciously chose not to implement safety policies, procedures and systems which would ensure that: (1) the acuity levels and needs of residents were consistent with the numbers and qualifications of direct caregivers; and (2) treatment/care prescribed by a physician was provided in accordance with state laws and professional standards.

110.    Accordingly, the Corporate Defendants, by their operational choices and decision making, and to satisfy their desire to grow profits, created a dangerous condition that caused harm to residents.

111.    These choices to establish and implement such policies and the conscious decision not to implement corrective actions or procedures disregarded the duties which the State of Kansas and federal government imposed upon the Corporate Defendants and HILLTOP LODGE HEALTH AND REHABILITATION CENTER, LLC.

112.    Because the staffs were below necessary levels, and because the staffs that were present were not properly qualified or trained, the residents at HILLTOP LODGE HEALTH AND REHABILITATION CENTER, LLC including Resident, failed to receive even the most basic care required to prevent catastrophic injury and death. This negligence and resulting injuries ultimately led to and caused Resident's injuries as described above.

113.    During Resident's residency at HILLTOP LODGE HEALTH AND REHABILITATION CENTER, LLC, Resident sustained physical injuries as described in more detail above, because of the acts, omissions, decisions, and choices made by the Corporate Defendants in operating HILLTOP LODGE HEALTH AND REHABILITATION CENTER, LLC.

114.    During Resident's residency at HILLTOP LODGE HEALTH AND REHABILITATION CENTER, LLC, the Corporate Defendants negligently failed to provide and/or hire, supervise and/or retain staff capable of providing Resident with a clean, safe, and protective environment, and that, because of this failure, Resident suffered neglect, abuse, severe personal injuries, conscious pain and suffering, and deterioration of Resident's physical condition as further described above.

115.    The Corporate Defendants manage, operate, and direct the day-to-day operations of HILLTOP LODGE HEALTH AND REHABILITATION CENTER, LLC and the Corporate Defendants are liable for this direct involvement in the operations of such Facility. The Corporate Defendants are therefore liable to the Plaintiffs for the neglect of and injuries to Resident.

116.    HILLTOP LODGE HEALTH AND REHABILITATION CENTER, LLC and the Corporate Defendants have been named as Defendants in this lawsuit for their individual and direct participation in the torts and causes of action made the basis of this lawsuit, having:

        a.   Chosen to disregard the duties and responsibilities which HILLTOP LODGE HEALTH AND REHABILITATION CENTER, LLC, as a licensed skilled nursing facility, owed to the State of Kansas and its residents;

        b.   Created the dangerous conditions described by interfering with and causing HILLTOP LODGE HEALTH AND REHABILITATION CENTER, LLC to violate Kansas statutes, laws and minimum regulations governing the operation of said skilled nursing facilities;

        c.   Superseding the statutory rights and duties owed to skilled nursing facilities residents by designing and mandating dangerous directives, policies, management, and day to day operation of HILLTOP LODGE HEALTH AND REHABILITATION CENTER, LLC;

        d.   Caused the harm complained of herein; and

        e.   Choosing to disregard the contractual obligations owed to the State of Kansas and the Federal Government to properly care for the residents in exchange for payment of funds for such care.

## COUNT I

## **Wrongful Death Against All Defendants**

117.   Plaintiffs incorporate by reference the allegations previously set forth and further allege as follows.

118.   At all times material hereto Resident was in a defenseless and dependent condition.

119.   As a result of Resident's defenseless and dependent condition, Resident relied upon Defendants to provide for their safety, protection, care, and treatment.

120.   At the time of the negligent acts and occurrences complained of herein and at all other times relevant hereto, Defendants, and their agents and employees, owed a legal duty to Resident to exercise that degree of skill and learning ordinarily exercised by members of their respective professions under the same or similar circumstances.

121.   At all relevant times, Defendants had a duty to act in accordance with the standards of care required of those owning, operating, managing, maintaining, and/or controlling a skilled nursing Facility.

122.   These duties required Defendants to implement and enforce policies and procedures to ensure the proper care for, and treatment of all residents including Resident.

123.   These duties required Defendants to have sufficient and qualified staff at HILLTOP LODGE HEALTH AND REHABILITATION CENTER, LLC to ensure the proper care for, and treatment of all residents including Resident.

124.   These duties required Defendants to ensure that HILLTOP LODGE HEALTH AND REHABILITATION CENTER, LLC's nurses and other staff were properly educated and trained regarding the care for, and treatment of all residents including Resident.

125.    These duties required Defendants to ensure that HILLTOP LODGE HEALTH AND REHABILITATION CENTER, LLC was properly capitalized to ensure the proper care for, and treatment of all residents including Resident.

126.    Specifically, during their care and treatment of Resident, Defendants and their agents, servants, and/or employees breached their duties and were guilty of the following acts of negligence by failing to measure up to the requisite standard of care, skill, and practice ordinarily exercised by members of their profession under the same or similar circumstances, including by:

      a. Failing to respond to documented critical oxygen saturation of 88% with system alarm indicating oxygen had dropped to 80% or below on December 26, 2023, despite active physician orders requiring notification for O2 <88%;

      b. Failing to respond to documented severe hypothermia (temperature of 92°F) on December 26, 2023;

      c. Failing to provide any DVT prophylaxis to a resident with every major risk factor for deep vein thrombosis, including complete immobility, morbid obesity (BMI 63), venous insufficiency, peripheral vascular disease, and heart failure;

      d. Discontinuing oxygen monitoring on May 22, 2023, seven months before Resident's death, despite active CPAP orders requiring pulse oximetry monitoring;

      e. Discontinuing DVT-protective leg care orders (ACE wraps, leg soaks, TED hose) despite documented DVT risk factors;

      f. Failing to recognize and respond to a pattern of life-threatening hypoxia documented throughout 2022-2023, including oxygen saturations as low as 62% without emergency intervention;

      g. Failing to implement contact precautions after MRSA was cultured from Resident's leg wound in October 2023;

      h. Failing to respond to critical potassium level of 6.6 mEq/L documented on November 1, 2023, despite warnings of cardiac arrhythmia and arrest risk;

      i. Failing to adequately assess, monitor, document, treat, and respond to Resident's respiratory condition despite history of tracheostomy and chronic respiratory failure;

      j.  Failing to ensure CPAP compliance despite documentation that the device was "on his forehead" or "on floor";

      k.  Failing to address Resident's identified problem with nebulizer equipment (mask too large for trach);

      l.  Failing to respond when Resident's roommate heard him calling for help, resulting in delayed emergency response and prolonged hypoxia;

      m.  Documenting impossible vital signs (temperature readings of 96.6°F and 84°F one minute apart) suggesting falsified records or failure to respond to profound hypothermia;

      n.  Failing to recognize social withdrawal and decreased responsiveness as signs of developing sepsis;

      o.  Failing to provide adequate staffing to respond to Resident's needs.

127.  As a direct and proximate result of the individual and collective acts of negligence of Defendants as described above, Resident was harmed and suffered non-economic damages, including pain, suffering, mental anguish, disability, disfigurement, and loss of enjoyment of life; death; and other damages.

128.  As a direct and proximate result of the individual and collective acts of negligence of all Defendants as described above, Plaintiffs suffered damages including, loss of companionship, loss of comfort, loss of guidance, loss of counsel and loss of instruction, pain, suffering, bereavement, and mental anguish.

WHEREFORE, Plaintiff Carole Baugh (individually), prays for judgment against Defendants in an amount more than $75,000.00 and in an amount a jury deems fair and reasonable including only non-economic damages.

## COUNT II

### Pain and Suffering by the Estate Against All Defendants

129.  Plaintiffs incorporate by reference the allegations previously set forth and further allege as follows.

130.  At all times material hereto Resident was in a defenseless and dependent condition.

131.    As a result of Resident's defenseless and dependent condition, Resident relied upon Defendants to provide for their safety, protection, care, and treatment.

132.    At the time of the negligent acts and occurrences complained of herein and at all other times relevant hereto, Defendants, and their agents and employees, owed a legal duty to Resident to exercise that degree of skill and learning ordinarily exercised by members of their respective professions under the same or similar circumstances.

133.    At all relevant times, Defendants had a duty to act in accordance with the standards of care required of those owning, operating, managing, maintaining, and/or controlling a skilled nursing Facility.

134.    These duties required Defendants to implement and enforce policies and procedures to ensure the proper care for, and treatment of all residents including Resident.

135.    These duties required Defendants to have sufficient and qualified staff at the Facility to ensure the proper care for, and treatment of all residents including Resident.

136.    These duties required Defendants to ensure that the Facility's nurses and other staff were properly educated and trained regarding the care for, and treatment of all residents including Resident.

137.    These duties required Defendants to ensure that the Facility was properly capitalized to ensure the proper care for, and treatment of all residents including Resident.

138.    Specifically, during their care and treatment of Resident, Defendants and their agents, servants, and/or employees breached their duties and were guilty of the following acts of negligence by failing to measure up to the requisite standard of care, skill, and practice ordinarily exercised by members of their profession under the same or similar circumstances, including by all the acts and omissions set forth in Count I above.

a. Failing to respond to documented critical oxygen saturation of 88% with system alarm indicating oxygen had dropped to 80% or below on December 26, 2023, despite active physician orders requiring notification for O2 <88%;

b. Failing to respond to documented severe hypothermia (temperature of 92°F) on December 26, 2023;

c. Failing to provide any DVT prophylaxis to a resident with every major risk factor for deep vein thrombosis, including complete immobility, morbid obesity (BMI 63), venous insufficiency, peripheral vascular disease, and heart failure;

d. Discontinuing oxygen monitoring on May 22, 2023, seven months before Resident's death, despite active CPAP orders requiring pulse oximetry monitoring;

e. Discontinuing DVT-protective leg care orders (ACE wraps, leg soaks, TED hose) despite documented DVT risk factors;

f. Failing to recognize and respond to a pattern of life-threatening hypoxia documented throughout 2022-2023, including oxygen saturations as low as 62% without emergency intervention;

g. Failing to implement contact precautions after MRSA was cultured from Resident's leg wound in October 2023;

h. Failing to respond to critical potassium level of 6.6 mEq/L documented on November 1, 2023, despite warnings of cardiac arrhythmia and arrest risk;

i. Failing to adequately assess, monitor, document, treat, and respond to Resident's respiratory condition despite history of tracheostomy and chronic respiratory failure;

j. Failing to ensure CPAP compliance despite documentation that the device was "on his forehead" or "on floor";

30

k. Failing to address Resident's identified problem with nebulizer equipment (mask too large for trach);

l. Failing to respond when Resident's roommate heard him calling for help, resulting in delayed emergency response and prolonged hypoxia;

m. Documenting impossible vital signs (temperature readings of 96.6°F and 84°F one minute apart) suggesting falsified records or failure to respond to profound hypothermia;

n. Failing to recognize social withdrawal and decreased responsiveness as signs of developing sepsis;

o. Failing to provide adequate staffing to respond to Resident's needs

139. As a direct and proximate result of the individual and collective acts of negligence of Defendants as described above, Resident was harmed and suffered non-economic damages, including pain, suffering, mental anguish, disability, disfigurement, and loss of enjoyment of life.

140. The actions of defendants were malicious, wanton, grossly negligent and reckless, and performed in reckless disregard of the welfare and safety of Resident and others, such that, in addition to damages for pain and suffering, defendants are liable for punitive damages for their grossly negligent care of Resident.

141. At the time defendants caused and allowed Resident to suffer respiratory failure, MRSA pneumonia, septic shock, pulmonary embolism, and bilateral cerebellar stroke, they knew that their conscious disregard to provide adequate staff; properly capitalize Facility, train, and/or supervise their agents, servants and/or employees; respond to documented critical vital signs; provide DVT prophylaxis; and implement respiratory monitoring during the two years preceding Resident's death and the year of death created a high degree of probability of injury to residents, and consciously disregarded the safety of all residents including Resident.

142.    Accordingly, defendants showed a complete indifference to, or conscious disregard, for the safety of others, including Resident and warrants punitive damages be assessed against defendants in an amount that is fair and reasonable and will punish defendants and deter them and others from similar conduct.

143.    As a direct and proximate result of defendants' negligence, and complete indifference to, or conscious disregard, for the safety of others, including Resident, Resident was harmed and suffered non-economic damages, including conscious pain, suffering, mental anguish, disability, disfigurement, and loss of enjoyment of life.

144.    The Estate is entitled to a jury trial as to the amount of punitive damages pursuant to the Seventh Amendment of the United States Constitution and *Jones v. United Parcel Services, Inc.*, No. 09-3275 (10th Cir. 2011).

        WHEREFORE, Plaintiffs (The Estate) pray for judgment against Defendants in an amount more than $75,000.00 and in an amount a jury deems fair and reasonable under the circumstances, including non-economic damages and past medical expenses.

## <u>PLAINTIFFS DEMAND A JURY TRIAL ON ALL ISSUES SO TRIABLE</u>

Respectfully Submitted,

STEELE LAW FIRM II, LLC

*/s/ Jonathan Steele*
Jonathan Steele
MO#63266/KS#24852/OK#35997
Email: jonathan@nursinghomeabuselaw.com
Direct: (913) 356-9630
Office: (816) 466-5947
Fax: (913) 416-9425
nursinghomeabuselaw.com

Missouri Office
2029 Wyandotte, Suite 100
Kansas City, MO 64108

Oklahoma Office
15401 N. May Ave., Suite 1100
Edmond, OK 73013

ATTORNEYS FOR PLAINTIFFS

## **CERTIFICATE OF SERVICE**

I hereby certify that the below-signed Attorney signed the original of the above and foregoing and is maintaining the original copy at said Attorney's office, and that on or shortly after December 26, 2025, a copy of the above and foregoing will be personally served on each defendant pursuant to the applicable state and federal rules.  Proofs of service will then be filed with the Court.

*/s/ Jonathan Steele*
Attorney for Plaintiffs